## John D. Bush, Trustee, v. Clark Downey and Jacob Strawn, Executors, etc., et al.

96    503
100    438
a195s    82

1. CHANCERY PRACTICE—*When the Findings of a Master are Conclusive.*—Where the proofs in a chancery proceeding are conflicting and consist in part of oral testimony, and the finding of the master who hears the proofs and sees the witnesses, is supported by that of the chancellor, the Appellate Court will not feel warranted in overturning his conclusions.

Creditor's Bill.—Appeal from the Circuit Court of Marshall County; the Hon. NICHOLAS E. WORTHINGTON, Judge, presiding, Heard in this court at the April term, 1901. Affirmed. Opinion filed July 12, 1901.

W. T. WHITING, attorney for appellant.

BARNES & MAGOON, attorneys for appellees Christopher C. Broaddus, William F. Broaddus, Gail H. McCulloch and Andrew S. Broaddus.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

On December 9, 1897, Francis H. Bond died testate, and his will was duly admitted to probate in the County Court of Marshall County. Andrew S. Broaddus was named as a legatee therein, and became entitled to a distributive share which it was estimated would amount to $2,500 or $3,000. On January 15, 1898, by two instruments slightly different

in words, but of the same meaning, he assigned his entire interest in said estate (except $150, to be paid H. L. Taylor), to his son, Christopher C. Broaddus. C. C. Broaddus soon thereafter filed the originals in the office of the county clerk in the estate of said F. H. Bond, deceased, and delivered copies of said assignment to Clark Downey and Jacob Strawn, the executors of said will. Prior thereto, on November 15, 1897, Mrs. Jennie Hewitt Broaddus, the second wife of said A. S. Broaddus, had leased from Hattie A. Greer, through her agent and trustee, John D. Bush, the premises known as 104 N. Madison avenue, Peoria, for two years from that date, at a rental of $53 per month, payable monthly at the end of each month. There Mrs. Broaddus kept roomers. About the fore part of November, 1898, an arrangement was made to cut passageways through from 104 to 102 and 100 North Madison avenue, also owned by Mrs. Greer, and unite the three places, terminate the pending lease and take a new lease for two years from November, 1898, at $100 per month, payable at the end of each month. A new lease was prepared from John D. Bush to A. S. Broaddus, dated November 15, 1898, but it was signed only by Bush. The place was thereafter run by Mrs. Broaddus as a boarding house or hotel, under the name "Hotel Madison." On the 15th day of November, in either 1898 or 1899, A. S. Broaddus gave John D. Bush an order on said executors of the estate of F. H. Bond, deceased, to pay Bush any amount due from A. S. Broaddus to John D. Bush for rent for house 100–102–104 N. Madison avenue, Peoria, and deduct the amount from the interest of said A. S. Broaddus in said estate at each distribution of said estate till the claim of Bush was paid in full. The last figure in the year of date had been changed. Bush testified the paper was executed and dated in 1898; A. S. Broaddus that it was in 1899. A letter from Bush to Strawn, one of the executors, advising him of this order, which letter and the postmark on the envelope are dated December 1, 1898, seem to settle it that this order was given Bush November 15, 1898. On October 3, 1899, A. S. Broaddus gave Bush a judgment note due on

demand after date, for $1,164.15, with interest at six per cent, with "reasonable dollars for attorneys' fees" in case of a confession of judgment thereon.   On November 11, 1899, in vacation in the Circuit Court of Marshall County, Bush took judgment on said note for $1,219.95, including $50 attorney fees, besides costs; and on said day an execution issued to the sheriff of said county, who on November 25, 1899, returned said execution *nulla bona*.   Thereupon on November 28, 1899, said Bush began this suit by filing a bill in equity against A. S. Broaddus and C. C. Broaddus, and against Downey and Strawn, executors of Bond's estate.

The bill charged the recovery of said judgment, the issue and return of said execution, that A. S. Broaddus had no property in said county out of which the judgment could be made, and that said judgment was recovered on an indebtedness contracted about January 1, 1898.   It set up the death and will of Bond, the legacy to A. S. Broaddus, and that the Bond estate is solvent.   It further charged that on January 15, 1898, and after A. S. Broaddus had contracted the debt for which said judgment was obtained, said A. S. Broaddus, for the purpose of hindering and delaying the collection of said indebtedness by complainant, made a pretended assignment of said legacy to his son, C. C. Broaddus, but said assignment was fraudulent and void as to the rights of complainant and the creditors of said A. S. Broaddus; that subsequent to said assignment said C. C. Broaddus paid said A. S. Broaddus part of the several installments of said legacy, but refuses to pay them to said A. S. Broaddus if he will pay them upon complainant's judgment.   The bill further charges said C. C. Broaddus claims he only holds said legacy for the use and benefit of said A. S. Broaddus, and that he is willing at any time to pay over to A. S. Broaddus any sum he may recover on said legacy, but refuses to pay any which he might use to pay complainant's judgment, which hinders complainant from collecting his judgment and is a fraud on his rights. The rest of the bill contains the formal parts of a creditor's

bill or bill for the discovery of assets, claiming a full account of all interests the other defendants hold equitably or legally belonging to A. S. Broaddus; but answer under oath was waived. By an amendment to the bill complainant stated that though said judgment was taken in his own name, it was for rent due his sister, Mrs. Greer, for whom he had for years acted as agent and trustee. A. S. Broaddus and C. C. Broaddus filed separate answers to the bill, as did also Wm. F. Broaddus and Gail H. McCulloch, though they were not named as defendants. Complainant replied to said answers. The executors of Bond's estate filed a formal answer, admitting they were executors, but calling for proof of all other allegations. The answers of the main defendants set up and stated the consideration for said assignment hereinafter narrated, and denied all fraud and all intent to defraud Bush or any one else. The answers of C. C. and W. F. Broaddus and Mrs. McCulloch denied that when the assignment to C. C. Broaddus was made the debt afterward merged in complainant's judgment had already been contracted, but averred it was contracted long after said assignment to C. C. Broaddus. The cause was referred to the master to take and report proofs, with conclusions of law and fact. The master took and reported the proofs, and found the facts and equities with defendants. After overruling exceptions to said report, the court approved the report and dismissed the bill for want of equity, adjudging, however, one-fourth of the costs of taking proofs against defendants. Complainant prosecutes this appeal from said decree.

The first wife of A. S. Broaddus died at Lacon in 1872, leaving three children—W. F. and C. C. Broaddus and Gail H., now Mrs. McCulloch. She left an estate to said children. A. S. Broaddus was appointed their guardian and received their estate, amounting to over $5,000. He appropriated it all to his own use, and they received none of it. From that time till the death of F. H. Bond in December, 1897, said A. S. Broaddus never had any property from which the children's estate could be recovered.

During that time he lived outside the State for ten years. The only surety on his bond as guardian also became insolvent, and was discharged in bankruptcy in 1879, before any of the children became of age. Soon after the death of Bond, said three children by the first wife met at Lacon to consider whether they should take any steps to get that legacy from their father to apply on his debt to them. It was determined an effort should be made to get the legacy, and that the matter should be placed in the hands of C. C. Broaddus, and he should have power to arrange it as he thought best, and the others should be bound by whatever he might do in the matter; and the proof is that C. C. Broaddus determined to bring suit if his father refused to turn over the legacy. C. C. Broaddus visited his father at Peoria and presented the matter to him. His father agreed to assign his entire interest in the Bond legacy to C. C. Broaddus for the benefit of his three children by his first wife, in full discharge of their demands against him as their guardian. C. C. Broaddus went home and drew an assignment, submitted it to a lawyer, who drew another, and sent both papers to his father by mail. The latter immediately executed them on January 15, 1898, and returned them to C. C. Broaddus, who at once took the steps above narrated to bring notice of the assignment home to the executors of the Bond estate. The executors recognized the assignment, and made two payments to C. C. Broaddus, evidently before this bill was filed. . The facts stated in this paragraph are proved, and the only thing above stated which is controverted is whether the assignment was executed for the purpose of paying said debt from A. S. Broaddus to the children of his first wife. The testimony of all the parties to the transaction is direct and positive that such was its purpose and only purpose. The testimony to the contrary consists of things alleged to have been said and done by the parties inconsistent with that claim.

When the proofs were taken A. S. Broaddus was sixty-four years of age, and his second wife was forty-three. There are five children of the second marriage. It is clear

that A. S. Broaddus is and has always been financially unsuccessful and inefficient, while his present wife is ambitious and energetic, and is the sole support of her family. It is no doubt a fact that when she first learned of this assignment, her husband gave her to understand that it was only in trust, and that C. C. Broaddus would give it back or turn over the money whenever requested, and that for a time this measurably satisfied her. When she learned that it was not to be returned she became very angry, and there were painful family scenes, and she threatened to leave her husband unless all or most of the legacy was put into her hands. There were a number of interviews between C. C. Broaddus and Mrs. J. Hewitt Broaddus, at most of which A. S. Broaddus was also present, and one which included nearly all of the children. The abstract of what the several witnesses testify was said in these conversations is very meager. A careful examination of this proof in the record discloses a hopeless conflict. If C. C. Broaddus said what certain witnesses attribute to him he either holds the assignment for his father's benefit or he falsely so stated to mislead his stepmother. If the testimony of other witnesses is true C. C. Broaddus never made any statement inconsistent with his title to this legacy for the benefit of himself and his full brother and sister. At one interview a paper was prepared, and signed by A. S. Broaddus, which he and C. C. Broaddus did not intend should be carried out, but which they hoped would pacify Mrs. Broaddus. This paper was not signed by C. C. Broaddus, it did not pacify Mrs. Broaddus nor would she hear what it was, and it was destroyed, and the proof as to what it purported to provide is in hopeless conflict. As to the facts resting upon oral proof it is impossible to say from reading it in the record where the truth lies. The witnesses against C. C. Broaddus outnumber those in his favor. On the other hand, the proofs supporting the assignment are on the whole the more reasonable and probable. It is a serious question whether A. S. Broaddus gave due consideration to the natural rights of his second wife and her children, when he

turned this windfall entirely over to the children of his
first wife, but that is not a matter for decision here.   C. C.
Broaddus advanced to his father from time to time since
the assignment sums amounting to nearly as much as he
has so far received thereon.   This may have been in recog-
nition of his father's right to the fund, but it may also have
been only the continuation of the course the proof shows
he pursued for a long time before—that of advancing his
father money from time to time when the latter needed it
and called for it.   It may also have been intended to quiet
the resentment of his stepmother and prevent her leaving
his father.   That A. S. Broaddus gave a later order to pay
the legacy to Bush shows him weak, but does not bind his
children.   A. S. Broaddus testifies he told Bush at the
time that the order would not be paid.   Nor are his children
bound by his inconsistent statements about the assignment,
made since he delivered it.

It is not true, as charged in the bill, that at the time of
the assignment to C. C. Broaddus, A. S. Broaddus owed to
Bush or Mrs. Greer the debt afterward put in judgment.
On January 15, 1898, when the assignment was executed,
there was $53 rent due, but the lease was to Mrs. Broad-
dus, and she alone was liable.   Complainant put in evidence
receipts for $20 and $25 paid on the rent after that; and
the proof implies various sums were thereafter paid on the
rent from time to time, including $100 on one occasion, so
that the $53 due on January 15, 1898, was unquestionably
paid.   Indeed the note for $1,164.15 given by A. S. Broad-
dus on October 3, 1899, was apparently for all rent unpaid
to date, and if so, shows nearly all the rent for the first
year had been paid before that note was given.   A. S.
Broaddus was not liable for the first year's rent, except
such part as was included in the note, and did not become
liable therefor till he signed that note.   He talked with
Bush when the premises were first rented, but the lease was
under seal, and he was not a party to it, and the conversa-
tion he had with Bush when negotiations were being con-
ducted by his wife, did not bind him to pay the rent.   The

record does not .show that when A. S. Broaddus executed this assignment he had any creditors except his three children by his first wife.

While some of the oral testimony raises doubts in our minds, yet when all the proof is considered we do not feel warranted in overturning the conclusion of the master, who saw the witnesses, supported by that of the chancellor. The decree is affirmed.