## Emily A. Bogue et al. v. Robert A. Franks.

1. CHANCERY PRACTICE—*When Master's Findings are Conclusive.*— The findings of the master, as approved by the court, will be sustained, unless manifestly against the weight of the evidence.

2. SETTLEMENTS—*A Party Accepting Benefits of a Settlement Can Not Open it after a Lapse of Time.*—Where parties have received from a settlement, and retained, all the benefits they contracted for, and acted on the settlement, it should not be opened, after a lapse of three years' time, for fraud.

**Foreclosure of a Trust Deed.**—Error to the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge, presiding. Heard in this court at the October term, 1901. Affirmed. Opinion filed March 6, 1902.

**Statement.**—Robert A. Franks, defendant in error, filed a bill against the plaintiffs in error, Emily A. Bogue and Hamilton B. Bogue, her husband, the Guaranty Title &

Trust Company, trustee, and others, to foreclose a trust deed executed by said defendants Bogue and wife, to the Guaranty Title & Trust Co., to secure payment of a promissory note made by defendants Bogue and wife, of date October 23, 1894, for the sum of $18,000, payable five years after the date thereof, to their own order, with interest at the rate of seven per cent per annum, payable semi-annually, the interest being evidenced by ten notes. The principal and interest notes were indorsed :

"Pay to the order of Henry Phipps, Jr.
EMILY B. BOGUE,
HAMILTON B. BOGUE."

"Pay to the order of Robert B. Franks.
HENRY PHIPPS, JR."

The bill was filed February 2, 1897. Subsequently it was dismissed as to all defendants except plaintiffs in error and the Guaranty Title & Trust Company. The defendants Emily A. Bogue and Hamilton B. Bogue filed their joint answer to the bill April 29, 1897. The answer is a mere denial of the material allegations of the bill, and sets up no substantive defense. The trustee also answered the bill. Replications were filed to the answers and the cause was referred to Dickens, master in chancery, to take proofs and report. November 5, 1897, Dickens, master, reported in favor of the complainant; but on exceptions to the report it was set aside on the ground of variance between the allegations of the bill and the evidence, and, by leave of court, the complainant amended his bill to correspond with the evidence, and the defendants, the Bogues, filed an answer to the amended bill. The answer is very lengthy, but the main defense relied on is that the note and trust deed were obtained by fraud, in a certain settlement between the Bogues and Henry Phipps, Jr., John Walker, H. A. Gardner and Charles Strobel (referred to as Phipps et al.), in regard to certain real estate transactions, in which settlement and as part thereof, the note and trust deed in question were executed, and that Phipps et al. took advantage of the necessitous condition of the Bogues. The answer, as abstracted, contains the following :

. "That said premises described in complainant's bill were the separate property of this defendant, Emily A. Bogue; that she was not indebted to said syndicate and in no way legally involved in their business affairs or of said H. B. and G. M. Bogue; but she was in great concern and distress of mind on account of the misfortunes of her husband, H. B. Bogue, and the demands of Phipps et al. upon him, and would consent to what might relieve him, even to the sacrifice of her homestead, and she therefore acceded to such demand that she execute said note and trust deed described in complainant's bill; that these defendants show that she received no part of the $40,000, except the sum of $716.10; that the free agency of the Bogues was overcome by reason of their necessities; that the syndicate took advantage of their condition, and that the said note and trust deed are without consideration and void, except as to the sum of $716.10."

. A replication was filed to the answer, and the cause was referred to Master in Chancery Leaming to take proofs and report the same and the evidence taken before Master Dickens, with his conclusions. Master Leaming reported in favor of the complainant, and that there was due the complainant the sum of $22,575.71. The master finds that the settlement between the Bogues and Phipps et al., the fairness of which is contested by plaintiffs in error, was fair and free from duress, and should not be re-opened. With regard to the claim of Emily A. Bogue—that she was in great distress of mind when she executed the trust note and deed, and that she received only $750 of the money advanced by Phipps et al. on the faith of them—the master finds as follows:

"It is contended by E. A. Bogue that she only received something like $750 of the $18,000 secured by a trust deed. I find from the evidence that on January 17, 1895, she wrote the following letter:

'CHICAGO, January 17, 1895.

To H. B. Bogue: You are hereby authorized to deliver the note for $18,000, signed by you and me and secured by my trust deed, to the Title Guarantee & Trust Company of Chicago, bearing date October 23, 1894, to Henry Phipps, Jr., or to John Walker for him, upon the payment of the sum of $18,000 to you or as you may direct, and I hereby

ratify and confirm the delivery of both said notes and trust deed.

EMILY A. BOGUE.

Witness: H. B. BOGUE, JR.'

That immediately after their execution, the notes and trust deed of E. A. Bogue were delivered to Judge Tuley, to secure the payment of $14,000 due from G. M. Bogue, as receiver, and were held nearly three months by Judge Tuley, when said ' Frank's Exhibit 25 ' (the trust deed) was delivered to said Phipps et al.; whereupon, on said 17th day of January, 1895, in compliance with said letter of the said E. A. Bogue, the said Phipps et al. paid $14,000 to Mr. High, the attorney of the creditors of the G. M. Bogue receivership, said $14,000 being an indebtedness for which Judge Tuley held said notes and trust deed, and the check of $4,000 was given by Phipps et al. to the order of E. A. Bogue, and delivered to H. B. Bogue; and on January 17, 1895, said notes and trust deed were delivered to Phipps et al., in pursuance of the terms of 'Frank's Exhibit 25;' that said check for $4,000 was afterward indorsed by E. A. Bogue and the $4,000 paid thereon; that all of the $18,000 for which said notes and trust deed were executed as aforesaid was paid by said Phipps, under the expressed direction of E. A. Bogue. I find there is no evidence to show any influence of Phipps et al. upon E. A. Bogue to execute the trust deed, and that there was nothing said or done by said Beck that amounted to duress over her."

The report is very full, and the findings of the master are in favor of the complainant on all the material questions involved.

Seventy-nine objections were made by defendants to the master's report, which were ordered to stand as exceptions on the hearing. The court overruled the exceptions, confirmed the report, and rendered a decree accordingly.

HAMILTON B. BOGUE, JR., and PLINY B. SMITH, attorneys for plaintiff in error; JOHN S. MILLER, of counsel.

GARDNER & STERN, attorneys for defendant in error.

MR. JUSTICE ADAMS delivered the opinion of the court.

The main questions presented by the record are, whether the master's findings, approved as they were by the court,

that the settlement between the Bogues and Phipps et al.
was fair and free from duress, moral or otherwise, and that
Emily A. Bogue was not unduly influenced by Phipps et al.
or Beck, to execute the note and trust deed, are manifestly
against the evidence; because, if not so, they must be sus-
tained.   In Siegel v. Andrews & Co., 181 Ill. 350–356, the
court say:

"The first contention raises a question of fact, which has
been passed on adversely to appellants by the master.   This
finding has been approved by the chancellor, and after a
careful reading of the evidence we can not say that its
weight is manifestly and clearly against the finding, and
that being so, we can not and will not disturb it."

This is especially the rule when the evidence is conflict-
ing.   Bush v. Downey, 96 Ill. App. 503–510.

The settlement in question involved numerous transac-
tions and details, as will hereafter appear.   The evidence
shows that the Bogues, about the time of the settlement,
were largely in debt; that there were judgments against
them for a large amount; that a capias had been issued
against them involving a claim of about $1,200, and George
M. Bogue had been ordered by the Circuit Court to pay into
court $14,000, which was due from him as receiver, and
which the Bogues had used in their business; that they were
financially embarrassed and had no money, of which they
were greatly in need, and that their only available means
was real estate so largely incumbered by mortgages that
money could not be borrowed on it, and that their equities
in it were of no market value, and were substantially
unsalable.

The claim of plaintiffs in error against which the master
and court have found, is that Phipps et al. took advantage
of their necessitous condition to make an unfair settlement;
that certain claims which the Bogues had against Phipps et
al. were unfairly rejected, and unwarranted claims of Phipps
et al. against them were enforced, and that they, by reason of
their financial necessities, were compelled to submit to
whatever terms were proposed by Phipps et al.   George
M. Bogue testified that Jacob S. Beck, who had formerly

been bookkeeper and cashier for the Bogues, but had ceased to be such in February, 1894, and was afterward employed by Phipps et al., applied to Hamilton B. Bogue for opportunity to examine the accounts of the Bogues with Phipps et al., and that he was given every facility to do so; that Beck spent several months in the examination, and about the 17th of October, 1894, informed the Bogues that he had completed it; that Beck expressed sympathy to witness, on account of their trouble, and the notoriety given to it by the newspapers, and said he had found, from his examination of the accounts, that the Bogues were largely indebted to Phipps et al., but thought, in view of their equities in real estate, a settlement might be made by which they could get money to relieve present necessities, and asked how much they wanted, and witness told them about $50,000, and listed on paper, items aggregating that amount. Witness further testified, in substance, that a list was made by him of certain pieces of real estate in which the Bogues had equities, with witness' estimate of the values of the equities; and a list of claims of the Bogues against Phipps et al. was also made out; that Beck said he would go to Pittsburg that night and talk the matter over with Walker, who lived in Pittsburg, with the view of bringing about a settlement, and witness says he was glad to have Beck go to Pittsburg. Witness further testified that he told Beck that the settlement suggested by him was a hard one, but it was better for the Bogues, if by it they would be relieved from their embarrassment and its consequent troubles; that Beck went to Pittsburg that night, and in a couple of days, on a Saturday morning, he and Walker came to the office of the Bogues in Chicago, and Mr. Walker stated that Beck had been to Pittsburg to see him in regard to a proposed settlement, and that he had come to effect one if possible; that witness objected to several of the claims which Beck had found due from the Bogues, and that some of the claims were stricken from the list by Walker; that Walker went over the different items of the equities of the Bogues, and said he should want to form his own opinion of their value; that witness said he wished Mrs.

H. B. Bogue's residence on Greenwood avenue left out, as
he thought it would be difficult to get her to sign, but
Walker said that it would have to be included by way of
mortgage, as part of the consideration for the $40,000
agreed to be furnished, the mortgage to be for $18,000;
that Walker also said the Bogues might redeem the follow-
ing pieces of property on the following terms:   The Hyde
Park property within a year by paying $100,000; a piece
north of Mrs. Bogue's property by paying $9,000 within
three years; a piece south of the same property by paying
$6,000 within three years; and the Washington street prop-
erty on payment of $20,000 extra within the same time.
Mrs. Bogue's homestead is the property described in the
trust deed.  Witness further testified that on the next Mon-
day morning Walker, Beck, Gardner, Hamilton, Bogue and
the witness, George M. Bogue, met together, and it was
agreed that the accounts should be settled; that Walker
was to furnish $40,000, and the Bogues were to convey to
Phipps et al. their equities in the properties listed, and a
mortgage was to be made on Mrs. Bogue's homestead; that
of the $40,000 agreed to be paid, witness received immedi-
ately $1,900, and then $1,000, and the last money was paid
February 2, 1895; that during the progress of the settle-
ment (which was not fully carried out till February 2, 1895)
the Bogues sold the pieces north and south of Mrs. Bogue's
property, and used the proceeds of such sales in paying off
a second mortgage on a piece of property included in
the settlement, which, by the terms of the settlement,
they had to satisfy; that they also sold the Washington
street property for $5,000 more than the estimated value of
their equity in it, and that Mr. Walker allowed them the
$5,000, and, subsequently, Walker advanced $5,000 more
on certain conditions.

Hamilton B. Bogue, witness for defendants, and who
was present when the settlement was agreed on, testified
that Mr. Walker stated that the Greenwood avenue prop-
erty should go into the settlement or he, Walker, would go
away, and witness then said that he would bring about the
making of the mortgage.

John Walker, who made the settlement with the Bogues, testified that in the negotiation for the settlement he excluded from the claims against the Bogues which had been reported by Beck as a result of his examination, a large amount. He further testified as follows:

"When we got through, I stated, 'Now, Mr. Bogue, if these securities can be turned over to us I will hand you over $45,000, and we to get quit claims for the property, and a receipt, and the claims that are outside of the $45,000; and, on the other side, we will give you clear acquittances for all claims of any kind we may have against you on all past records up to date.' I do not recall that H. B. Bogue said anything just then, but he came in just then, and G. M. Bogue went over his paper and recited the conversation that the two of us had had. There were no corrections that he appeared to make on his statement, and G. M. Bogue said he hoped the matter would go through, and be settled upon these terms."

Beck testified that he commenced the examination of books of the Bogues, September 4, 1894, and that October 18, 1894, he went to the Bogues' office for the purpose of continuing an examination which he had started the previous day; that he was nearly through the examination; that G. M. Bogue asked him if he could not do something toward disposing of the equities; that they made a list of the equities, the values of which were stated by Bogue, and a statement of assets and liabilities, and he, Bogue, made out a list of counter claims; that Bogue said he was willing to sell the equities for $40,000, and witness said he thought $30,000 ample; that after they got through, G. M. Bogue stated that he wished to consult with his brother; that, on the same or the next day, H. B. Bogue said to witness that his brother had told him that he, witness, had undertaken an adjustment of their affairs, and witness answered yes, that he was going to write to Mr. Walker and enclose a statement which had been prepared, and Mr. Bogue said, "Well, can you not go there? I think it will be better if you will go to Pittsburg;" and witness agreed to do so, and left that afternoon; but before he left, Bogue sent him a list of amounts he would need, the total of which was $50,000;

that witness saw Mr. Walker in Pittsburg, and they re-
turned to Chicago together. Beck's testimony corrobo-
rates that of Mr. Walker as to what occurred at the time
the settlement was agreed on.

Following is a statement made out at the first interview
between G. M. Bogue and Beck, before Beck went to Pitts-
burg, showing the lands in which the Bogues had equities,
George M. Bogue's estimate of the values of the lands, the
incumbrances on them, and Bogue's estimate of the values
of the equities; also the claims of Phipps et al. presented by
Beck; also, under the word " Credit," claims of the Bogues
against Phipps et al., presented by G. M. Bogue. It will
be observed that Bogue fixed the value of the equities by
deducting, in each case, the total of incumbrances from his
estimate of the value of the land.

J. S. Beck and Geo. M. Bogue.

October 18, 1894.

LANDS, ETC.

| | | | | |
|---|---|---|---:|---:|
| 1 | Fifty-third street, 300 feet at $600....$180,000 | | | |
| | Lake avenue, 175 feet at $300 ........ | | 52,500 | |
| | Jefferson avenue, 175 feet at $150...... | | 26,250 | |
| | Fifty-third street improvements....... | | 40,000 | |
| | Lake and Jefferson avenue............ | | 8,000 | |
| | | | $306,750 | |
| | Less N. Y. L. I. Co......... | $100,000 | | |
| | Less Hoyt estate.......... | 60,000 | 160,000 | |
| | | | | $150,000 |
| 2 | Hitchcock purchase........ | | $40,000 | |
| | Less due Hitchcock........ | $18,000 | | |
| | Less due mortgage......... | 15,000 | 33,000 | |
| | | | | 7,000 |
| 3 | West purchase, Ellis avenue, $5,600................ | $4,000 | $1,600 | |
| | Stewart subdivision lots, $12,400.............. | 11,000 | 1,400 | |
| | | | | 3,000 |
| 4 | Greenwood avenue property. All land and improvements, | | $85,000 | |
| | | $25,000 | | |
| | | 9,000 | | |
| | Less mortgages......,.... | 6,000 | 40,000 | |
| | | | | 45,000 |

Bogue v. Franks.

| | | | |
|---|---|---|---|
| Washington street property equity............... | | | 20,000 |
| Lancaster farm............ | | | 30,000 |
| Oak Park, Nevens.......... | | $34,000 | |
| Less mortgage............. | | 26,000 | |
| | | | 8,000 |
| Stocks, margins............ | | | 10,000 |
| | | | $273,000 |
| Walker purchase........... | | 30,000 | |
| Less mortgage............. | 11,000 | | |
| | 7,000 | 18,000 | |
| | | | 12,000 |
| | | | $285,000 |

### PHIPPS' CLAIMS.

| | | |
|---|---|---|
| Oak Park profit..................... | $35,000 | |
| Do. note........................... | 30,000 | |
| Cruse............................... | 2,000 | |
| Squatters .......................... | 1,200 | |
| Highlands........................... | 20,000 | |
| H. Heights profit................... | 10,000 | |
| Claim, H. A. G..................... | 30,000 | |
| Claim proved...................... | 20,000 | |
| Extras accounting.................. | 20,000 | |
| La Salle and Monroe...... $100,000 | | |
| Less commissions......... 25,000 | | |
| | 75,000 | |
| Judgments vs. Properties.... | 15,000 | |
| | | 825,000 |

### CREDIT (forward).

| | |
|---|---|
| Forward ........................... | 825,000 |

### CREDIT.

| | | |
|---|---|---|
| La Salle and Monroe, | | |
| Commission on loan.............. | $25,000 | |
| Service on construction........... | 5,000 | |
| Renting service.................. | 6,000 | |
| Sundry services.................. | 5,900 | |
| Gardner unsold lots............... | 4,500 | |
| Martin extension commission........ | 2,500 | |
| Services on improvements.......... | 5,000 | |
| | | 53,000 |
| | | $205,000 |

The master refers to the foregoing document as " Exhibit 3." His report contains the following :

"That on October, 1894, the Bogues were financially embarrassed. That on the 18th of October, 1894, Beck met G. M. Bogue and the claims were discussed, and some of them were objected to by G. M. Bogue, and the claims of the Bogues against Phipps et al. were listed as shown by 'Exhibit 3,' and the equities of the Bogues were talked over; that Beck said he would write Pittsburg for the $40,000 or $50,000 which the Bogues needed in their distress. That subsequently H. B. Bogue asked Beck to go to Pittsburg, which he did, and returned to Chicago with Walker on the morning of October 20, 1894; that they went to the office of the Bogues and met G. M. Bogue, and shortly after H. B. Bogue, and the equities of the Bogues, as shown on 'Defendant's Exhibit 3,' were gone over, but Walker refused to accept items 2, 3 and 8 on said 'Exhibit 3.' The values of the other equities, which Walker stated he would take, were then and there fixed and agreed upon, and the values placed thereon by G. M. Bogue when said 'Exhibit 3' was made, and were in some instances reduced, said reduction aggregating about $62,000, leaving the value of the equity to be taken about $191,000, including the equity in the homestead of E. A. Bogue involved in this suit. Of the Phipps claim, as shown in said 'Defendant's Exhibit 3,' the following were thrown out: Oak Park property, $35,000; Cruse claim, $2,000; claim of H. A. Gardner, $30,000. Certain other items therein were reduced, namely, 'extra accounting' reduced, $15,000; La-Salle and Monroe, $6,000; judgments against properties, $5,000; making a total reduction on said Phipps et al. claims, $93,000; said claims thereby reduced from $258,200 to $165,200, which balance was then and there agreed upon by said parties. That of the Bogue claims against Phipps et al., as shown in 'Defendant's Bogue Exhibit 3,' the following were thrown out: Commission on loans, $25,000; service on construction, $5,000; renting service, $6,000; sundry services, $5,000; Martin extension commission, $2,500; services on improvements, $5,000; thereby reducing the claims of Bogues from $53,000 to $4,500. That H. B. Bogue at first protested against a mortgage being given in this case, but on Monday, October 23, 1894, the settlement of all matters of difference was then and there agreed upon, and the Bogues were to convey all their equities in all their properties mentioned in 'Exhibit 3,' and the mortgage of E. A. Bogue for $18,000, and Phipps et al. to advance to the Bogues $40,000, and the balance to be applied with the $165,200 agreed upon as full payment of

said equities so to be conveyed. That after said settlement certain liens had to be wiped off from the various properties, and it was not until the second of February, 1895, that they could clear up these matters. That during this time the Bogues sold the equity in the Washington street property for $5,000 more to other parties than the sum at which it went into the settlement. That said sale was so reported to Phipps et al., who thereupon ratified such sale, and accepted other property in lieu thereof, and gave the Bogues the benefit of the $5,000 so realized. That also the Greenwood avenue equities were sold to other parties, and Phipps et al. ratified such sales and accepted other properties in place thereof. The amount of money so realized was used by the Bogues in paying off an incumbrance on the Hyde Park equity, which they were to do under the terms of the settlement. That it was first agreed that Phipps was to advance the sum of $40,000, but that Phipps really advanced the sum of $50,000, by including the $5,000 he allowed the Bogues to retain on the sale of the Washington street equity, and including the amount paid by Phipps et al. on account of back interest on an incumbrance on the Hyde Park property, which was properly chargeable against the Bogues, and including $500 charged by Gardner for attorney's fees for examination of abstract."

These statements of the master are supported by the evidence. The Bogues sought the settlement, not Phipps et al. George M. Bogue applied to Beck for assistance to dispose of the equities. H. B. Bogue urged Beck to visit Mr. Walker at Pittsburg to suggest a settlement, and George M. expressed himself as glad that Beck was going to Pittsburg. When the settlement was being negotiated, and Walker said that unless the Greenwood avenue property were included he would withdraw, H. B. Bogue said he would bring about the giving of a mortgage of that property. These facts tend to prove that the Bogues were much more anxious for a settlement than were Phipps et al. The evidence is that the market was very much depressed at the time, so much so that unincumbered property did not find ready sale, and largely incumbered, as the property of the Bogues was, it was impossible to sell it or borrow on it as security. It was mortgaged for all it would bear, and the equities had no market value. Under such

circumstances it seems highly improbable that the Bogues could have disposed of their equities to any one except a creditor, and there is no evidence to support the view, that, at the time of the settlement, they could have sold them to any one more advantageously than they did to Phipps et al. In the then state of the market, and incumbered as the properties were, with judgments against the Bogues, and numerous claims being pressed against them, it would seem absurd to measure the value of their equities by the difference between George M. Bogue's estimate of the value of the lands and the amount of the incumbrances. We concur in the finding of the master, that the settlement was voluntary on the part of the Bogues, and not forced by Phipps et al., and that the latter took no unfair advantage of the financial necessities of the Bogues. Between October 23, 1894, and February 2, 1895, the interval in which the Bogues were engaged in clearing up certain matters, in accordance with the agreement of settlement, no objection or claim of unfairness was made by them. In the answer of plaintiffs in error to the original bill, they merely denied the allegations of the bill, which was such as is usually filed to foreclose a trust deed, and it was not until November 24, 1897, when plaintiffs in error filed their answer to the amended bill, that they first alleged fraud in the settlement. If there was any fraud, which, as we think, does not appear from the evidence, plaintiff in error, H. B. Bogue, must have known it at least as early as October, 1894. Emily A. Bogue, in the joint answer of plaintiffs in error, avers that she was in no way involved in the business affairs between George M. and H. B. Bogue and Phipps et al., and that Phipps et al. took advantage of the financial condition of the Bogues; but it is not averred in the answer when she made the discovery. If George M. Bogue, or H. B. Bogue, her husband, so claimed, it is extremely improbable that she was not so informed till November, 1897—so improbable as to be well nigh incredible. We concur in the finding of the master, that, at this late day, after plaintiffs in error and George M. Bogue have received

from the settlement, and retained, all the benefits which they contracted for, and acted on the settlement, it should not be opened.   1 Beach on Mod. Eq. Juris., Sec. 74, *et sequens;* Warren v. Wallridge, 61 Ill. 173; Hall v. Fullerton, 69 Ib. 448; McCarty v. Marlette, 80 Ib. 526; Brown v. Brown, 142 Ib. 409, 428–9.

It is not averred in the answer, nor is the claim sustained by the evidence, that undue influence was resorted to, to induce Mrs. Bogue to execute the trust deed.   The averment in the answer is as follows:

"That said premises described in complainants' bill were the separate property of this defendant, Emily A. Bogue; that she was not indebted to said syndicate and in no way legally involved in their business affairs or of said H. B. and G. M. Bogue; but she was in great concern and distress of mind on account of the misfortune of her husband, H. B. Bogue, and the demands of Phipps et al. upon him, and would consent to what might relieve him, even to the sacrifice of her homestead, and she therefore acceded to such demand that she execute said note and trust deed described in complainants' bill, and these defendants show that she received no part of $40,000, except the sum of $716.10."

It is not claimed that Phipps et al. or any of them, approached Mrs. Bogue on the subject or did anything to induce her to execute the trust deed; but it is claimed, in argument, that Beck wrongfully influenced her so to do. The evidence is that Beck's authority in the premises was limited to an examination of the accounts, that he had absolutely no authority so far as the settlement was concerned. Hamilton B. Bogue testified that Mrs. Bogue, in conversation between witness and her, objected to signing the mortgage, and said she wanted to see Mr. Beck and understand from him how it was, and that she would not sign till she saw him, and witness told her that he had agreed with Beck to come the next day; that the next day Beck came to take Mrs. Bogue's acknowledgment, and that he, witness, heard Mrs. Bogue ask Beck, "Must I sign this?" and that Beck said, "There is no other way."   Mrs. Bogue testified as follows:

"I am the wife of H. B. Bogue. My husband first spoke to me about signing the mortgage in question. Mr. Bogue told me the distress in which he was, and how that unless this mortgage was signed that they were to be arrested, and he told me how they were being pushed by these different ones. I think at that time, that I knew that H. B. Bogue had been arrested on a capias, and that was the distress, and the reason that unless this mortgage was signed that then they would have to be sent to prison. I said to Mr. Bogue that I could not understand it, that as I had understood it I was never to part with this place under any conditions. I finally said to him that I would rather not sign this mortgage. I did not want to sign this until I saw Mr. Beck. I wanted to see him because I had known him and supposed that he was still in the employe of Bogue & Company. He always seemed so friendly and had been there to the house a great many times and I knew that he knew about the business and had always shown himself so interested; as he came there so sympathetic, I thought that—I said to Mr. Bogue that I would prefer to have first a talk with Mr. Beck before I signed it, and he said very well, I could do so. I think the conversation with Mr. Bogue took place in the evening after dinner. The next morning Mr. Beck came, and as I remember it he brought the papers with him and he came in. I said to him, of course all that night we had been in such distress about the home—I said to him, 'Mr. Beck, I can not understand this at all.' Mr. Bogue had told me that on no conditions whatever should I ever part with this place, not even if he went down on his knees to me; and he replied almost the same as Mr. Bogue, that he supposed that Mr. Bogue had no idea that such conditions would ever arise as had now arisen. I asked him then if there was any other way out of it. I know I sat down to the table to sign these papers, and I asked him that and he said, 'I suppose not,' and then I took up the pen and signed. I asked him first, I remember, and as I remember it he shook his head and said, 'I suppose not; there was no other way.' Then I signed the mortgage and notes in controversy in this suit."

In the cross-examination of Mrs. Bogue, the following occurred:

Q. "At the time of signing this mortgage, did you know anything as to the facts, as to whether H. B. Bogue, or Bogue & Company, were indebted to Phipps and others or not?" A. "I knew that he was. Of course I knew

about all this distress, and that was the reason that I signed it."

It thus appears that Mrs. Bogue's reason for signing the trust deed was the same which induced H. B. and George M. Bogue to seek a settlement with Phipps et al., namely, to relieve them from their then financial difficulties.

Mrs. Bogue testified that she obtained title to the property conveyed by the trust deed from Hamilton B. Bogue, her husband, and it appears from his testimony that he had much to do with her execution of the trust deed. He testified :

"I stated to Mrs. Bogue in a general way, prior to that time, that Phipps et al. made large claims for settlement in the affairs of our business transactions with them. I think I told her that they might be right or might be wrong to a large amount, but that in any event the distress was such that we had got to give up everything in order to get money to keep us out of prison. I told her I was liable to be arrested on a criminal suit. I told her of the one, an account of which had been published in the newspapers, and that there were other similar debts which might at any time be proceeded on in the same manner, and that there was a large balance due the Chicago Life Insurance Company."

Beck testified that he went to Mrs. Bogue's house merely to take her acknowledgment; that Mrs. Bogue had signed the trust deed when he arrived there, and that he asked her if that was her signature, and she said yes, and acknowledged it; that she made some remarks, to which he listened but made no response, and that he didn't say there was no other way. The master's finding that the money secured by the trust deed was applied in pursuance of Mrs. Bogue's directions, is fully sustained by the evidence. The evidence shows and the master finds that the note and trust deed were not delivered to Phipps et al. until January 17, 1895; that before that time they had been deposited with Judge Tuley of the Circuit Court, as security for and to stay contempt proceedings against George M. Bogue, who had been ordered, as heretofore stated, to pay $14,000 due from him as receiver. January 17, 1895, when the note

and trust deed were delivered to Phipps et al., Mrs. Bogue
wrote the following note, addressed to H. B. Bogue:

"You are hereby authorized to deliver the note for
$18,000 signed by you and me and secured by my trust deed
of the Title Guarantee & Trust Company of Chicago,
bearing date October 23, 1894, to Henry Phipps, Jr., or to
John Walker for him upon payment of the sum of $18,000
to you as you may direct, and I hereby ratify and confirm
the delivery of both said notes and said trust deed."

February 2, 1895, H. B. Bogue addressed to Henry
Phipps, Jr., the following letter:

"Of the eighteen thousand dollars represented by the
trust deed, to the Title Guarantee & Trust Co., and the
note secured thereby, dated October 24, A. D. 1894, made
for eighteen thousand dollars, by Emily A. Bogue and
myself, secured by the homestead premises, 4819 Green-
wood avenue, I hereby direct that one thousand dollars be
paid to Henry A. Gardner in return for that amount, which
he paid on my request to James L. High, for the estate of
the Chicago Life Insurance Company on December 24, A.
D. 1894, and that the further sum of thirteen thousand
dollars be now paid to said High for the estate and that the
balance of four thousand dollars be paid to myself.
                                    HAMILTON B. BOGUE."

Hamilton B. Bogue testified that the money was paid in
accordance with the instructions contained in his letter.
The same witness further testified that in July, 1897, the
trustee, by his request, released from the lien of the trust
deed the south seventy feet of the premises therein
described, and the same was sold. He says he can not
remember whether Franks was requested to consent to the
release; but it is obvious that the trustee would not have
released any part of the mortgaged premises without the
consent of the holder of the note. It also appears from H.
B. Bogue's evidence, that he paid interest on the sum
secured by the trust deed, and on one occasion informed
Mrs. Bogue that interest had been paid; also that he made
application for extension of time in which to pay interest,
and that he did not remember having made any objection
to Franks as to the validity of the mortgage.

George M. Bogue testified that prior to the settlement

the Bogues had loaned to Phipps et al. a book called the joint purchase account book, in which was entered, in detail, all the different purchases and transactions, month by month; that Phipps et al. had a similar book, but borrowed the copy of· the Bogues for comparison, representing that their book had not been kept up as closely as it should have been. He also testified that he had several times requested the return of the book, but that it was not returned until after the answer to the amended bill was filed. It is sought to be inferred that the book was retained by Phipps et al. to deprive plaintiffs in error of evidence; but it does not appear that in the first interview with Beck, when the accounts were gone over, or in the interview with Walker, when the settlement was agreed on, that any inquiry in regard to the book, or any suggestion that it was needed, was made; and it appears from the evidence that it was produced on the hearing before the master, and that Hamilton B. Bogue's attention was called to it while he was testifying. It also appears, from the testimony of George M. Bogue, that the joint purchase account book was not necessary for the information of the Bogues as to the state of the account between them and Phipps et al. He was questioned, and answered as follows:

Q. "Were the accounts of Bogue & Company with the syndicate kept on a separate set of books from the other books of their business, or the books of their other business ? Did they have a·separate set of books, or was it kept in the same books as their general business?"

A. "As far as the ledgers were concerned, the accounts of Bogue & Company with the syndicate were kept in the general books of Bogue & Company; the sales blotters the same way; the sales ledgers were kept separately for each subdivision as made, and the statement books contained the different accounts which had been running in the office, except one statement book, which was taken and has not been returned, which related alone to the books of the syndicate."

There is no evidence that the books mentioned in the· foregoing answer, except the "one statement book" therein mentioned, were taken from the possession of the Bogues.

After careful consideration of all the evidence and the elaborate argument of counsel, our conclusion is that the master's findings are sustained by the evidence. Therefore the decree will be affirmed.